**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-551 (TFH)** |
| **ROBERT FLYNT FAIRCHILD, JR.,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Robert Flynt Fairchild, Jr. to eleven months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.      INTRODUCTION

The defendant, Robert Flynt Fairchild, Jr., participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

Fairchild, a Marine veteran, spent two hours in the restricted area of the West Plaza of the Capitol Grounds, most of which at the front of the crowd. For more than an hour, Fairchild looked

---

[1] As of April 5, 2022, the approximate loss suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

for opportunities to weaken the perimeter established by the police to protect the Capitol Building. Acting on those opportunities, he took part in dragging multiple barriers back from the front line and into the crowd, which helped the growing mob eventually reach the Capitol Building. He also pushed against multiple police officers, individually and as part of a crowd, adding to the constant barrage that eventually caused police to retreat and allowed the building to be breached. Fairchild then entered the Capitol Building, and gleefully chanted "Fight for Trump" while inside.

The government recommends that the Court sentence Fairchild to eleven months of incarceration, which is the middle of the advisory Guidelines' range of 8-14 months. This sentence reflects the gravity of Fairchild's conduct, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Fairchild among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

2

As set forth in the PSR and the Statement of Offense incorporated into Fairchild's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in

the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Dkt. No. 35 (Statement of Offense) ¶¶ 1-7; PSR ¶¶ 12-18.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021 possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board." These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Image 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to

engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Image 1. They flooded the area labeled "Lower West Plaza" Area C on Image 1, pushing against the barricade there.



*Image 1: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

6

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds

7

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

*Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett

Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.      Fairchild's Role in the January 6, 2021 Attack on the Capitol**

Fairchild traveled from Orlando, Florida to Washington, D.C. and attended the "Stop the Steal" rally at the Ellipse on the morning of January 6. He made his way to the Capitol early in the Siege, and by at least 1:14 p.m., had arrived in the restricted area of the West Plaza of the Capitol grounds. As described above, a series of metal barriers had been set up by the police to contain the crowd and prevent the crowd from advancing toward the Capitol building. Numerous officers stood between the barriers and the Capitol building. They attempted to maintain the crowd on the

11

other side of the barriers.

For a large part of the next two hours, Fairchild, dressed all in green, walked back and forth along the barriers in the West Plaza and stood at the front of the crowd that was challenging and antagonizing the police. He not only witnessed extreme acts of violence against the police, but also made repeated attempts to wrest the metal barriers away from the officers. Working with the crowd, Fairchild successfully carried multiple barriers away from the line and back into the crowd, weakening the perimeter established by the officers.

For instance, at 1:14 p.m., Fairchild helped pull away a barrier being manned by Metropolitan Police Officers. It appears that Fairchild initiated the effort and then was assisted by the crowd in pulling the barrier away from the officers and back into the crowd. *See* Exhibits 1 & 2.[2]



*Screenshot from Exhibit 1: Video from the Body Worn Camera of a Metropolitan Police Officer*

---

[2] Video exhibits have been provided to the Court and defense counsel in advance of the sentencing hearing.

12



*Screenshot from Exhibit 1: Video from the Body Worn Camera of a Metropolitan Police Officer*



*Screenshot from Exhibit 2: Video from the Body Worn Camera of a Metropolitan Police Officer*

Fairchild was present when an officer employed a taser against a rioter who was involved in the tussle that ensued after the barrier was removed, at about 1:15 p.m.:



*Image 5: Open-Source Photograph from the West Plaza showing Fairchild watching as a police officer uses a taser to immobilize a rioter*

*See also* Exhibit 2 at timestamp 13:15:09-12.

Fairchild did more than remove barriers. He also joined a large crowd of rioters in an area where barriers between the police and the crowd had been removed as they swarmed and fought against officers on the West Plaza. The events reflected in the following videos occurred between approximately 1:08 p.m. and 1:18 p.m. Fairchild was among a crowd involved in a melee with police during which officers deployed chemical spray and projectiles, and rioters sprayed back and pushed the police. In Exhibit 3 (screenshot below), Fairchild aggressively pushed officers backward, and then continued to push the line of officers backward with the weight of the crowd pushing behind him amidst the exchange of projectiles before retreating from the front line of the

crowd. In Exhibit 4 (screenshot below), Fairchild pulled on another barricade. This video illustrates not just Fairchild's role in the civil order, but also the essential role that the bike rack barriers played in maintaining the separation between the riotous crowd and the police before the crowd succeeded in removing them.



*Screenshot from Exhibit 3: Open-Source video at timestamp 0:06. Fairchild can be seen during the first 20 seconds pushing officers backward, and then he continues to push the line of officers backward with the weight of the crowd pushing behind him for about another 30 seconds before he is hit by a projectile and retreats from the front of the line*



*Screenshot from Exhibit 4: Video from Open Source video; at timestamp 0:25. Fairchild can be seen pulling on a barrier.*

At one point, the officers succeeded in driving the rioters back behind the barriers. But at 1:23 p.m., immediately after another scuffle between rioters and police, Fairchild attempted to take advantage of a lull in the commotion and brazenly attempted to pull yet another barrier away.

Police managed to prevent this attempt. *See* Exhibit 5.



*Screenshot from Exhibit 5: Video from the Body Worn Camera of Metropolitan Police Officer P.N.*

Even when Fairchild was not actively challenging the officers, he largely remained at the front of the crowd and at times appeared to be looking for opportunities to press forward. *See* Exhibit 6.

17



*Screenshot from Exhibit 6: Video from the Body Worn Camera of Metropolitan Police Officer J.C.*

After almost an hour in the West Plaza, at 2:10 p.m., Fairchild once again tried to press forward. This time, during a scuffle between the rioters and the police, Fairchild used his back and shoulder to press against both the barrier and the officers standing behind it. *See* Exhibits 7 & 8.

18



*Screenshot from Exhibit 7: Video from the Body Worn Camera of Metropolitan Police Officer B.S.*



*Screenshot from Exhibit 8: Video from the Body Worn Camera of Metropolitan Police Officer J.C.*



*Screenshot from Exhibit 8: Video from the Body Worn Camera of Metropolitan Police Officer J.C.*



*Screenshot from Exhibit 8: Video from the Body Worn Camera of Metropolitan Police Officer J.C.*

During the scuffle, Fairchild's hat fell off, and officers discharged chemical spray as they tried in vain to bring the crowd under control. Fairchild was undeterred.

At 2:15 p.m., Fairchild yet again was back to pulling barriers away with the crowd. *See* Exhibit 9.





*Screenshots from Exhibit 9: Body Worn Camera of Metropolitan Police Officer J.C.*

As described above, by 2:28 p.m., with the situation of the police untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.

After almost two hours on the restricted grounds, Fairchild entered the U.S. Capitol building at 3:10 p.m. through a door with broken glass as other rioters climbed in through the window:



*Image 6: Screenshot from Closed Circuit Video of the Senate Wing Door of the U.S. Capitol Building*

Fairchild walked past a damaged wooden structure, then continued further into the building:



*Image 7:   Screenshot from Closed Circuit Video of the Senate Wing Door of the U.S. Capitol Building*

    While inside, Fairchild chanted with the crowd, "Fight for Trump!" while other rioters

climbed through the broken window of the Capitol Building. *See* Exhibit 10.



*Screenshot from Exhibit 10: Open-source Video from the Senate Wing Door area of the U.S. Capitol Building at timestamp 0:02*

He walked into the Crypt and out of camera-view for several minutes. He reappeared and exited through the same door he entered at 3:27 p.m., 17 minutes after he entered.

On August 27, 2021, FBI agents arrested Fairchild and searched his residence. They did not find any of his clothes from January 6. They seized two cell phones, but neither had any data from January 6. Fairchild exercised his right not to speak with the agents.

### *Defendant's Statement*

As a condition of his Plea Agreement, Fairchild submitted to an interview by the FBI on June 30, 2022. Fairchild told the agents that he drove from his home to Washington, D.C. with a friend and that he attended the rally held by President Trump. He then made a "spur of the moment" decision to follow a large crowd of people to the U.S. Capitol. He said that he heard yelling and saw some people being "testy" but that he did not foresee the event ending in violence. Fairchild claimed that he never saw projectiles or weapons. He acknowledged that at one point he grabbed a barricade but said that he let go when a police officer took ahold of the barricade. He also admitted to entering the Capitol Building. Fairchild said that he got "caught up in the moment" and made bad choices that day. He said that he took pictures inside the building and sent them to several people, but he then deleted them. He claimed that after January 6, he damaged his cellphone and later replaced it.

### *Injuries*

Although the government did not identify any officers who were directly injured due to Fairchild's conduct, his participation in this riot aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attack"). His aggressive and persistent conduct served to incite and embolden

24

other violent rioters around him.

### III.    THE CHARGES AND PLEA AGREEMENT

On January 26, 2022, a federal grand jury returned a superseding indictment charging Fairchild with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). Dkt. No. 26.

On May 11, 2022, Fairchild pled guilty to Count One, Civil Disorder in violation of 18 U.S.C. § 231(a)(3).

### IV.    STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, for the crime of Civil Disorder, Fairchild faces up to five years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years. Fairchild also agreed to pay restitution of $2000 to the Architect of the Capitol.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The U.S. Probation Office calculated Fairchild's sentencing guidelines as follows: a base offense level of ten pursuant to § 2A2.4(a), a three-level enhancement pursuant to § 2A2.4(b)(1)(A) because the offense involved physical contact, and a two-level reduction pursuant to § 3E1.1(a) for acceptance of responsibility, resulting in a total offense level of eleven. PSR ¶ ¶ 51-59. This calculation is consistent with the agreed total offense level calculation in the parties' Plea Agreement. *See* Dkt. No. 34 ¶ 5(A) (Plea Agreement).

The government also agrees with the U.S. Probation Office's calculation of Fairchild's criminal history as category I. PSR ¶ 56. Accordingly, based on an offense level of eleven, Fairchild's Guidelines imprisonment range is 8 to 14 months' imprisonment. Fairchild's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. This Guidelines range is in Zone B of the Sentencing Table.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court

must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Fairchild's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence;

(3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Fairchild's crimes support a sentence in the middle of the applicable Sentencing Guidelines range. Fairchild spent more than two hours on the restricted Capitol Grounds, largely at the front of the crowd in the West Plaza of the Capitol Grounds trolling for distractions or holes that he could take advantage of to press forward against the police line. Fairchild repeatedly acted on those opportunities and took part in dragging multiple barriers back from the front line and into the crowd. This undoubtedly contributed to the mob's effort to eventually reach the Capitol Building. Fairchild's conduct was not limited to attacking the barriers. He also pushed against multiple police officers individually and as part of a crowd, adding to the constant barrage that eventually caused police to retreat back and allowed the building to be breached. Fairchild then entered the Capitol Building, walked through the Crypt, and chanted "Fight for Trump."

Fairchild's actions on January 6 show a disturbing disregard for the rule of law coupled with a willingness to interfere with the police at the risk of harm to others, including uniformed police.

### B.  Fairchild's History and Characteristics

Fairchild's history and characteristics cut in both directions. On the one hand, Fairchild's four years of military service with the United States Marine Corps is truly laudable. He reports receiving a number of medals and awards during that service. PSR ¶ 85. The government also acknowledges Fairchild's self-reported medical condition. *Id*. ¶ 80.

On the other hand, since leaving the military in 2006, Fairchild has had six separate criminal convictions aside from the present case. Some of these convictions appear to be related to substance abuse (including two DUIs), from which Fairchild reports to be in recovery. Nonetheless, this is far from Fairchild's first contact with law enforcement, and indeed he very nearly qualified for a criminal history category of II as a result of a marijuana-related conviction that was 14 months too old to count toward his criminal history. PSR ¶ 65.

Finally, Fairchild's conduct in this case is particularly troubling in light of his military experience. Someone with his background should have had far greater respect for both the rule of law and the role of law enforcement, as well as an appreciation for the danger inherent in the situation on January 6, and the danger that he personally caused to members of law enforcement.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense,

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's

this factor supports a sentence of incarceration. Fairchild's criminal conduct, repeatedly contributing to the civil disorder during the Capitol Siege, is the epitome of disrespect for the law. While Fairchild stalked the Capitol grounds and entered the Capitol itself, it should have been abundantly clear to him that lawmakers and the police officers who tried to protect them were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor

---

[4]  *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. First, although Fairchild has a criminal history category of I, his history of convictions shows a record of repeated violations of law. Second, although Fairchild reported that he made a "spur of the moment" decision to go to the Capitol, once he arrived, he stayed for hours. He repeatedly pushed against with police despite standing amongst plumes of chemical spray and the exchange of projectiles. None of this deterred him. He had so many opportunities to turn around and leave. And so many opportunities to take steps to de-escalate, rather than escalate, the violence and danger. But reason and life experience did not deter him. A serious sentence of incarceration is needed to deter Fairchild from similar choices in the future.

## E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

F.     **Unwarranted Sentencing Disparities**

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Fairchild and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 231(a)(3) defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Few Capitol Riot defendants have been sentenced for convictions under 18 U.S.C. § 231(a)(3), and fewer still for conduct comparable to Fairchild's. In one instructive case, *United States v. Nolan Cooke*, 22-cr-00052-RCL, the defendant was also convicted under § 231 and also faced a Guidelines range of 8 to 14 months. Like Fairchild, Cooke stood at the front line of rioters who broke through the police barricade, albeit on the East side of the building. In one instance, he similarly grabbed a bike rack and pushed it against the police line. Some of Cooke's behavior was more extreme in that he also screamed and cursed at officers, struck a previously broken window with a pole, and made social media posts celebrating the riot. On the other hand, Cooke never entered the Capitol building and voluntarily cooperated with law enforcement when they interviewed him during the execution of a search warrant of his residence on January 21, 2021. Cooke also had no criminal history. The government requested an 11-month sentence for Cooke and the Court sentenced him to a year and a day. A comparison of multiple § 3553(a) factors for Cooke and Fairchild shows that similar sentences for these two defendants is appropriate.

VII.    **RESTITUTION**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[5] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The government has not identified victims in this case who suffered bodily injury as a result of Fairchild's conduct. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Fairchild must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Fairchild played in the riot on January 6.[6] As the Plea Agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. Since then, the total damage figures have increased to more than 2.7 million dollars in losses. *See* footnote 1, above.

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of eleven months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, three years of supervised release, restitution of $2,000, and the mandatory $100 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
ACTING UNITED STATES ATTORNEY

</div>

BY:     */s/ Alison B. Prout*
        Alison B. Prout
        Assistant United States Attorney
        Georgia Bar No. 141666
        75 Ted Turner Drive, SW
        Atlanta, Georgia 30303
        (404) 581-6000
        alison.prout@usdoj.gov