UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.                                                                              CASE NO. 21-CR-551-TFH

ROBERT FLYNT FAIRCHILD
_____/

SENTENCING MEMORANDUM

The Defendant, Robert Flynt Fairchild, by and through his undersigned attorney, herby files this Sentencing Memorandum in support of a reasonable sentence that is no greater than necessary to accomplish the purposes of sentencing enumerated in 18 U.S.C. §3553(a)(1-7).

Mr. Fairchild was arrested in the above case on August 27, 2021, in the Middle District of Florida, where he lives. PSR ¶ 11. He had his initial appearance on the same date and was released on a personal recognizance bond. PSR ¶ 11. At the time of sentencing, Fairchild will have been on pre-trial release for more than 13 months. He has followed all of the rules and regulations of his release and has received counseling services through the Veterans Affairs (VA) Administration in Orlando. On July 1, 2022, Dr. Nicholas James wrote a letter

1

certifying that Fairchild had successfully completed a course of substance use disorder (SUD) in individual and group treatment for four months. Dr. James indicated that Fairchild's treatment goals were met and that treatment had concluded and that he had completed 12 sessions of cognitive behavioral therapy as well as six individual sessions. PSR ¶ 60a. Fairchild has complied with all other conditions of his pre-trial release.

### HISTORY AND CHARACTERISTICS OF ROBERT FAIRCHILD

Other the birth of his two children, there are two dates that stand out in the life of Robert Fairchild. The first date is September 11, 2001. The second date is January 6, 2021. These two dates will forever stand out in the life of Robert Fairchild.

On September 11, 2001, Mr. Fairchild had just turned 20 years old and was living and working in LaGrange, Georgia. After the terrorist attacks that occurred that day, Fairchild decided he wanted to serve and protect his country by enlisiting in the military. Although there were many options open to him, Fairchild chose to enlist in the United States Marine Corps. He saw that his country had been under attack and he wanted to do whatever he could to protect his country. His first day in service was April 29, 2022 and, four years later, he

was honorably discharged from the Marine Corps.  *See* DD Form 214, attached Exhibit A-1.   Fairchild is proud of his service to his country, serving in a combat zone in the time of war.

The second noteworthy day in Fairchild's life, was January 6, 2021, nearly twenty years after the 9/11 attack.   Fairchild, as this Court knows, has pled guilty to the crime of civil disorder for his actions taken at the U.S. Capitol that day. He knows his actions on January 6th were wrong and that he should never have entered the Capitol grounds on that day.   Regrettably for Fairchild, because of his actions, he will now be a convicted felon and will not be able to vote, serve on a jury or possess a firearm.   He is ashamed of his behavior that day.   He has accepted responsibility for his actions and stands ready to accept his punishment.

Fairchild was one of three children born to Robert Fairchild, Sr., and Angela Hendricks.  As a child, Fairchild was the oldest of the children.   His younger siblings were his sister, Hannah Livingston, now 28 years old, and his brother Matthew Fairchild, who is 37 years old.   PSR ¶ 50, 51.   Fairchild's parents subsequently divorced, when Fairchild was 12 years old. PSR ¶ 52.   His father later went to prison and his mother remarried. Fairchild's mother and sister both have written letters of support to this Court.   As a child and as a teenager,

Fairchild actively participated in sports and music, playing the trumpet from elementary school until high school. As an athlete, Fairchild played football and was a star wrestler on the LaGrange High School wrestling team. He was active in his church and in Boy Scouts during his youth. As his mother Angela Hendricks pointed out in her letter to this Court:

> Robby has always been very dependable, responsible, honest and courteous and has always displayed a high degree of integrity. He has always shown a generous, kind and devoted character. Growing up he was always at service to our elderly neighbors, helping with any task they needed him to do.

*See* attached letter, Exhibit B-6.

Robert Fairchild was also close to his younger sister, Hannah Livingston. Being much older than his sister, Fairchild acted as a father figure to his sister after his parents' divorce. Ms. Livingston, like her mother, is also a registered nurse. In her letter to this Court, she explained the positive role in her life that Fairchild played while she was growing up:

> I have always looked up to my big brother Robby. He was in high school when our parents divorced and so he was sometimes responsible for the care of myself and our brother Matthew while our mother worked the night shift in the Emergency Room. He taught me how to ride my first bicycle and gave me love for learning history. He was always a good big brother teaching me to have goals, integrity, and good morality in my character. He always stressed to me to love and respect my fellow man regardless of their

4

life choices.

*See* attached letter, Exhibit B-8.

Fairchild graduated from LaGrange High School in 1999 when he was seventeen years old and began working in West Georgia.   PSR ¶ 62.

In February of 2002, less than five months after the September 11 attacks, Robert Fairchild enlisted in the US Marine Corps via the Delayed Enlistment Program.[1]   He formally joined the Marine Corps in April, 2002.   By that time, United States Marines were already on the ground in Afghanistan and lives had been lost.   The United States was at that point also openly preparing for a second ground war in Iraq.[2]   Despite the known danger, Mr. Fairchild chose the Marine Corps, the branch of service historically suffering the highest casualty rates, particularly in ground-oriented conflicts.[3]   Not only did he choose the Marine Corps but within that service he chose the Military Occupation Specialty ("MOS") of Infantry.[4]   That MOS is widely considered as the most dangerous

---

1 *See* April 28, 2006 Certificate of Release or Discharge from Active Duty (hereinafter "DD-214").
2 Plans For Iraq Attack Began On 9/11 - CBS News; 9/11 and Iraq: The making of a tragedy (brookings.edu)
3 Combat, Casualties, and Compensation: Evidence from Iraq and Afghanistan, August 2018 Naval Post Graduate School paper, Laura Armey, Thomas J. Kniesner, John D. Leeth, and Ryan Sullivan. SSRN-id3249899.pdf
4 Marine Infantry - What It's Like To Be In The Marine Corps Infantry (sandboxx.us)

in the Marines as it mission is "to locate, close with, and destroy the enemy by fire and maneuver, or repel the enemy's assault by fire and close combat."[5]

Fairchild did two lengthy tour of duties in Iraq, always in a significant combat zone. During most of 2003, Fairchild's platoon commander was Gunnery Sergeant Jason Doran. In his letter to this Court, Doran states the following:

> My memory serves me well of Mr. Fairchild. He served honorably, faithfully and with due diligence under my command. His service was above par during this time but was not under common circumstances. He fought in the Battle of An Nasiriyah, a hotly contested battle which left our unit without adjacent infantry or logistical support for a week. Without logistical support this quickly led to a lack of food, water, medical supplies and ammo. During this time, Mr. Fairchild acted with surety of action and determination without complaining. He did what was necessary not only to his survival but other Marines. Our Battalion suffered losses to the point that we were no longer combat effective. Our follow up missions included defensive positions and offensive actions that supported other units in the March to Baghdad. While these follow up operations were minor and more in support roles, he continued to perform his duties in a professional manner.

On September 6, 2004, during Fairchild's second tour of duty in Iraq, Fairchild's unit was ambushed by the enemy in an I.E.D. attack. The ambush changed Fairchild's life, and changed the lives of fellow Marines who were

---

[5] *Id.*

6

injured in the ambush. Three of those Marines - Jeffrey Sanders, Robert Thompson, and Leslie Walden - have written letters to this Court describing the bravery and selflessness displayed by Robert Fairchild on that day in Iraq eighteen years ago. *See attached letters, Exhibit* B-1, B-2, B-3.

These letters more than adequately explain the type of man that Robert Fairchild was and the actions he took on behalf of his country and his Marine comrades. One of the Marines, Jeffrey Sanders was blown out of the Humvee by the explosion and suffered a severed leg. More distressing was the fact that the other marines in the unit did not initially know that Sanders was not accounted for. When the platoon leader discovered that Sanders was still in the "kill zone", Fairchild risked enemy fire, went back to Sanders and carried him to safety, thereby saving his life. As a result of those actions, Fairchild received a Navy Citation for his bravery and selflessness. The citation states the following:

### Citation

FOR HEROIC ACHIEVEMENT IN CONNECTION WITH COMBAT OPERATIONS AGAINST THE ENEMY WHILE SERVING AS RIFLEMAN FOR 2D SQUAD, 3D PLATOON, COMPANY B, BATTALION LANDING TEAM, 1ST BATTALION, 2D MARINES, 24TH MARINE EXPEDITIONARY UNIT, 1ST MARINE DIVISION IN SUPPORT OF OPERATION IRAQI FREEDOM II ON 6 SEPTEMBER 2004. ON THIS DATE, LANCE CORPORAL FAIRCHILD PERFORMED HIS DUTIES IN A HIGHLY EXEMPLARY AND PROFESSIONAL MANNER. AFTER HIS SQUAD HAD FALLEN VICTIM TO AN ATTACK BY AN IMPROVISED EXPLOSIVE DEVICE, HE WAS INSTRUMENTAL IN ASSISTING THE CORPSMAN TO EFFECTIVELY TREAT THREE URGENT CASUALTIES. LANCE CORPORAL FAIRCHILD, REALIZING THAT A MARINE WAS UNACCOUNTED FOR, RE-ENTERED THE KILL ZONE LOCATED THE MISSING MARINE AND BROUGHT HIM OUT OF HARM'S WAY. ADDITIONALLY, WHILE MORTARS BEGAN TO FALL HE ASSISTED IN SECURING THE WRECKAGE, ALLOWING THE REST OF THE PATROL TO DEPART. LANCE CORPORAL FAIRCHILD'S COURAGEOUS ACTIONS, INITIATIVE, AND COMPLETE DEDICATION TO DUTY REFLECTED GREAT CREDIT UPON HIMSELF AND WERE IN KEEPING WITH THE HIGHEST TRADITIONS OF THE MARINE CORPS AND THE UNITED STATES NAVAL SERVICE.

A few months after the ambush of September 6, 2004, one of the Marines who survived the attack that day, Lance Corporal Charles "Chuck" Hanson, Jr., was riding in a Humvee when it struck an I.E.D. Hanson was ejected from the Humvee and died instantly when the Humvee fell on top of him. Hanson was Robert Fairchild's best friend in the Marines. In 2008, Fairchild named his son after Lance Cpl. Charles Hanson, Jr.

On April 28, 2006, Fairchild's term of service was completed and he was Honorably Discharged. Like many other veterans, the war had changed him. Fairchild was diagnosed with post-traumatic stress disorder and traumatic brain injury. He started to drink and was arrested on charges relating to his use of alcohol. During his post-war efforts to have his post-traumatic stress disorder

and traumatic brain injury recognized by the VA, he was represented by Harold Hoffman, Esq., of the Veterans Legal Advocacy Group or VETLAG.

Mr. Hoffman represented Fairchild in an attempt to increase Fairchild's disability rating with the VA. After several years, the VA rated Fairchild's post-traumatic stress disorder at 50% and traumatic brain injury at 40%. Because of his disability, Fairchild receives a monthly check of $1998.52. Mr. Hoffman has written a letter to this Court regarding the efforts he has made in increasing Fairchild's disability rating with the VA. *See* Exhibit # B-6.

As is endemic amongst American combat veterans, Mr. Fairchild has struggled with his mental health since his discharge. [6] Importantly, he recognized the issues in himself shortly after his discharge and sought help from the VA where he remains a patient to this day.

Military service is widely acknowledged as a potential mitigating factor in sentencing. In the Sentencing Guidelines the pertinent policy statement provides, "Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other

---

6 How Common is PTSD in Veterans? - PTSD: National Center for PTSD (va.gov); *See also* A Needs Assessment of New York State Veterans: Final Report to the New York State Health Foundation (rand.org); Nearly a Quarter of New York Veterans Face Mental Health Challenges; More Coordination of Resources Needed | RAND.

offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.11.

Military service is commonly considered as a mitigating factor by courts, including the Supreme Court. In *Porter v. McCollum*, 558 U.S. 30, 43 (2009), a capital case involving the fatal shooting of two persons, the Court held that trial counsel rendered ineffective assistance by (among other things) failing to present mitigating evidence about the defendant's military service. The Court noted, "Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did." In *Kimbrough v. United States*, 552 U.S. 85, 110 (2007). The Court noted with approval that the defendant "had no prior felony convictions, that he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps, and that he had a steady history of employment."

In the interest of providing guidance to sentencing courts when considering military service, the Sentencing Commission has published a resource guide, which identifies two general aspects of military services which are "important in cases involving veteran-defendants":

> First, courts have considered the *type of service* and whether it warrants consideration based on a traditional practice of recognizing

10

military service to one's country.

Second, courts have considered *whether the defendant suffers from a mental or emotional condition* that is traceable to the defendant's military service and whether the condition contributed to commission of the offense. Accordingly, this report first takes note of traditional notions of leniency toward veterans, and next discusses some of the mental health and other consequences of military service that may be relevant to sentencing.

U.S. Sent'g Comm'n, *Case Annotations and Resources: Military Service - USSG § 5H1.11 - Departures and Booker Variances* (Jan. 2012), at 1. (emphasis supplied).[7]  Both aspects identified by the Commission are relevant in Mr. Fairchild's case.  However, of even greater importance here is what the fact of Mr. Fairchild's military service says about him as a human being and contributing member of his community.

In the present case, the undersigned asks this Honorable Court to consider Mr. Fairchild's military service in imposing a reasonable sentence, pursuant to §5H1.11 because:

(1) Mr. Fairchild's extraordinary overseas wartime combat military service warrants such consideration based on the traditional practice of recognizing military service to one's country; and

(2) Because Mr. Fairchild does suffer from a mental and emotional

---

[7] Available at http://www.ussc.gov/sites/default/ files/pdf/ training/primers/2012_01_ Military_ Service_5H1-11_ Departures_ Booker_ Variances.pdf. The resource summarizes 49 decisions, in 11 Federal circuits, illustrating the treatment of military service in sentencing.

11

conditions (PTSD).

The PSR has scored Fairchild at a guideline sentencing range of 8-14 months. PSR ¶ 73. The parties agree with the calculation. Paragraph 74 of the PSR correctly points out that the applicable guideline range is in Zone B of the Sentencing Table and that the minimum term may be satisfied in one of three ways. USSG § 5C1.1(c)(3) provides that the minimum term of incarceration may be satisfied by a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e).

In the instant case, this Court must consider the 18 U.S.C. §3553(a) factors in determining a reasonable sentence. In analyzing those factors, the undersigned requests that this Court impose a sentence that involves placing Fairchild on probation and serving any incarceration time in either a halfway house or in home confinement.

Such a sentence will adequately punish Fairchild and will also allow him to continue receiving the much needed services of the VA.

Respectfully submitted,

A. Fitzgerald Hall
Federal Defender, MDFL

*/s/ James T. Skuthan*
James T. Skuthan
Assistant Federal Defender
Florida Bar Number 0544124
201 South Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone 407-648-6760
Facsimile 407-648-6095
E-Mail: jim_skuthan@fd.org
Counsel for the Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that undersigned electronically filed the foregoing *Sentencing Memorandum* with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to Alison B. Prout, Assistant United States Attorney, this 13th day of October 2022.

                                                    */s/ James T. Skuthan*
                                                    Attorney for Defendant